UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>JONATHAN HENDERSON )<br>) | No. 1:21-cr-00079-CEA-CHS |

**REPORT AND RECOMMENDATION**

**I.  Introduction**

This matter is before the Court upon Defendant Jonathan Henderson's Motion to Suppress Results of Search of Home and Defendant's Statement as Fruits Therefrom [Doc. 47] which the District Court has referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)-(C). On February 4, 2021, police executed a search warrant at 1008 Crutchfield Street in Chattanooga, Tennessee. Defendant seeks to suppress evidence found at that address as well as statements he made when questioned by law enforcement twice on that same day. For the reasons stated herein, it is **RECOMMENDED** that the motion to suppress be **DENIED**.

**II.  Facts**

On February 3, 2021, Special Agent Lauren Moon applied for a single search warrant authorizing searches of two residences in Chattanooga—1008 Crutchfield Street and 829 South Germantown Road. In addition to information about Special Agent Moon's training and experience, the affidavit supporting probable cause stated the following concerning 1008 Crutchfield:[1]

> 10. During a search of law enforcement databases for [Defendant], the address of 1008 Crutchfield Street, Chattanooga, TN 37406 has been identified by your affiant as

---

[1] Information concerning 829 South Germantown is not the focus of the present discussion, as noted in Section III. However, information establishing probable cause for a search for contraband at 829 South Germantown is relevant when considering all the connections between that address and 1008 Crutchfield.

prior for [Defendant]. The records show the address as recent as 2/22/2020, based on utility information. Your affiant confirmed that the utilities at 1008 Crutchfield Street are in the name of Cynthia Henderson and have been in her name since 2017. Your affiant believes Cynthia Henderson to be a direct relative to Henderson.

\* \* \* \* \*

12. On February 1, 2021 at approximately 1100 hours, your affiant observed a Chevrolet Silverado Truck with Texas Registration "MYR3649" parked in the driveway at 1008 Crutchfield Street. This vehicle was also observed at 829 South Germantown Road on 1/27/2021.

13. On February 1, 2121 your affiant observed [Defendant] leaving 829 South Germantown Road and getting into the driver's seat of the aforementioned Dodge Ram with Colorado Registration: BIS665. Surveillance on the vehicle was maintained until the eye was lost in the area of Campbell Street. Your affiant then observed the Dodge Ram with Colorado Registration "BIS665" parked in the driveway of 1008 Crutchfield Street approximately 20 minutes after the visual on surveillance was lost.

14. On February 2, 2021, your affiant was advised by ATF SA Larkins that the aforementioned Dodge Ram was parked in the driveway at 1008 Crutchfield Street behind the aforementioned Chevrolet Silverado at approximately 0840 hours.

\* \* \* \* \*

16. In the past seventy-two hours, at the direction of your affiant, CS-2 arranged to purchase a quantity of heroin from [Defendant]. Prior to the operation, for surveillance and safety purposes, CS-2 was fitted with a listening/recording device. CS-2 was then provided a quantity of departmental funds to purchase the suspected heroin from [Defendant]. The CI was followed to the predetermined meet location specified by [Defendant] during a controlled/recorded phone call. Around 12:43 PM (EST), surveillance units observed the Dodge Ram with Colorado Registration BIS665 at 829 South Germantown Road prior to the deal. There was a dark blue Dodge Charger and dark blue Nissan Murano also at this residence. Surveillance followed the Dodge Ram and Dodge Charger to 3330 Ringgold Road which is the King Audio Stereo Installation business. At approximately 1:15 PM (EST) while surveillance maintained a visual at King Audio, CS-2 placed a controlled call to [Defendant] to align a purchase of heroin and CS-2 was provided a meet location by [Defendant]. A few minutes later, the Dodge Ram was observed leaving King Audio with an African American male later identified as [Defendant.] Surveillance then observed the Dodge Ram travel to 1008 Crutchfield Street where the African American male later identified as [Defendant] exited the vehicle and entered the residence for approximately 20-30 minutes. At approximately 1:56 PM (EST), the Dodge Ram was then observed leaving 1008 Crutchfield Street and arriving to the predesignated deal location. An African American male later identified as

[Defendant] was observed operating the Dodge Ram. CS-2 made contact with [Defendant] at this specified location and [Defendant] was positively confirmed to be the driver of the Dodge Ram. CS-2 exchanged an amount of departmental confidential funds for heroin. After the deal was completed, the CS-2 returned to the staging location where they turned over the suspected narcotics to your affiant. CS-2 confirmed that the male they met was [Defendant]. A field test of the purchased heroin was conducted and the substance field-tested positive for Fentanyl.

[Doc. 60-1 at 6-7].

The affidavit also contained a lot of other vehicle-related information, including connecting Defendant to a fraudulent identity employed to secure the use of various vehicles, such as the Chevrolet Silverado. The affidavit also stated:

Based on Affiant's training, experience, and participation in other investigations involving illegal drug trafficking, and major narcotics organizations, which investigations have led to numerous arrests and convictions, your Affiant is aware of the habits, characteristics, and practices of drug traffickers and their organizations, and has learned the following:

   a. Drug traffickers very often place their assets derived from their criminal activities in names of other persons or corporate entities other than their own names, or they will use false names and identities in order to avoid detection of these assets by law enforcement agencies so as to avoid forfeiture of the same.

   b. Drug dealers actually own and continue to use such assets derived from criminal activities and exercise dominion and control over this property, though it may be titled and recorded in the names of others.

   *   *   *   *   *

   e. Drug dealers very often will hide contraband, proceeds of drug sales and records of drug transactions in secure location such as their own residences, locations which they control but which are titled in the names of others, residences of others who are participants in or aiders and abettors of the drug conspiracy, their businesses, and bank safe deposit boxes to conceal them from law enforcement officials.

[*Id.* at 8-9].

When agents executed the warrant on February 4, 2020, they found "distribution quantities of fentanyl powder and marijuana, multiple firearms, ammunition, U.S. currency, and various drug paraphernalia." [Doc. 60 at 4].

### III. Standard of Review

Defendant's legal challenge under his present motion relates solely to the sufficiency of the search warrant, and Defendant has not requested or alleged grounds for a *Franks*[2] hearing. In such situations, "[w]ith great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021). A search warrant affidavit must show a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998)). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). In reviewing the magistrate's decision, "our job is not to reweigh the assertions in an affidavit but to ask whether the magistrate had a substantial basis for his conclusion." *United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019) (*en banc*) (citing *United States v. Perry*, 864 F.3d 412, 415 (6th Cir. 2017)). "[A]n issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000).

---

[2] For a defendant to challenge the truthfulness of the information in a search warrant affidavit, *Franks v. Delaware*, requires that he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [] the allegedly false statement is necessary to a finding of probable cause." 438 U.S. 154, 155-56 (1978).

IV.     Discussion

   A.     **Probable Cause**

Defendant only objects to the search at 1008 Crutchfield, conceding for purposes of this motion that probable cause existed with respect to 829 South Germantown. [Doc. 48 at 118-19]. He states that his "connection to 1008 Crutchfield as established by the affidavit is [] minimal and insufficient for probable cause." [*Id.* at 19].

Defendant cites various cases—including *Grant* and *Sanders*—to show how his argument should prevail based on similarities with the facts, rationale, and holdings of each. [*Id.* at 14-17]. The Government responds by distinguishing *Sanders* and citing cases to bolster its argument based on similarities to the facts, rationale, and holdings of each. [Doc. 60 at 6-8]. Defendant responds by distinguishing the cases cited by Government. [Doc. 63 11-14]. All of the cases cited by the parties hold important similarities to the instant case. However, since probable cause involves a totality of the circumstances inquiry, all of the cases cited by both parties can be distinguished in relevant ways. Thus, each holds somewhat limited persuasive value. However, the Court finds *United States v. Christian*, 925 F.3d 305 (6th Cir. 2019) (*en banc*), to be strongly persuasive, as discussed below.

The strength of Defendant's connection to 1008 Crutchfield is the key inquiry in this case for determining whether the "things sought" would reasonably be located there. First, Defendant had lived there within the last year; it was believed to be the residence of a close relative; and he appeared to be there quite frequently. This is certainly the type of residence Agent Moon described as often used for contraband based on her training and experience.

Second, Defendant was part of an identity fraud scheme used to procure various vehicles. A Chevrolet Silverado procured through such scheme and used by Defendant was seen parked at

both 1008 Crutchfield and 829 South Germantown in the days leading up to the search warrant application. Defendant's demonstration of this propensity for criminal deception made it even more reasonable for Agent Moon and the magistrate to believe Defendant would hide contraband at a location with which he was closely associated, but which was not his own residence.

Third, the Dodge Ram later used to travel to the relevant drug deal was seen parked at both 1008 Crutchfield and 829 South Germantown in the days leading up to the search warrant application. This fact added support to the belief that a nexus existed between Defendant and both residences. Defendant concedes probable cause existed for 829 South Germantown, but the panoply of connections between that address and 1008 Crutchfield supports the probable cause necessary for a search of the latter. Additionally, on the day before the search warrant application, both the Chevrolet Silverado and the Dodge Ram were seen parked at 1008 Crutchfield around 8:40 a.m. This concurrent presence of two vehicles directly tied to illicit activities is yet another fact supporting a nexus between evidence of Defendant's criminal activity and 1008 Crutchfield.

Finally, immediately after setting up a drug deal, Defendant drove the Dodge Ram to 1008 Crutchfield and entered the residence. About 20-30 minutes later, Defendant drove to the predesignated meet location and consummated the drug deal. The timing of Defendant's trip to 1008 Crutchfield and the subsequent direct travel to the drug deal lends substantial credence to the assertion in the application for search warrant that there was a nexus between Defendant's criminal activity and the 1008 Crutchfield residence.

To be sure, the facts discussed above lend varying degrees of support to probable cause—some carry more weight than others. But when viewed in the aggregate, as is required in a totality of the circumstances inquiry, the collective facts clear the required threshold to establish probable cause. However, because the Court finds particularly persuasive the fact that Defendant traveled

to 1008 Crutchfield, stopped there for a brief amount of time, and then proceeded directly to the drug deal, Defendant's arguments in this area deserve special attention.

Defendant claims that the case against him "is totally dependent upon the one observed buy when [Defendant] was fortuitously seen to travel from his mother's home to the buy." [Doc. 63 at 6]. There are three problems with Defendant's argument. First, there are many pieces of evidence of varying strength linking 1008 Crutchfield to Defendant's criminal activity, as discussed above. Second, Defendant's characterization as "fortuitous" that he happened to drop by 1008 Crutchfield on his way to the drug deal is a wishful interpretation by Defendant. The information presented in the affidavit made it equally plausible that Defendant stopped by 1008 Crutchfield to equip himself for the drug deal, and it was certainly reasonable for the magistrate to adopt that interpretation. Third, it is not solely the travel *from* 1008 Crutchfield to the drug deal that supports the magistrate's finding. Indeed, the timing of the travel *to* 1008 Crutchfield—immediately after setting up the drug deal and immediately before consummating the drug deal—carries even more significance.

Additionally, *United States v. Christian* weighs heavily against Defendant's assertion that the fortuitous travel to his mother's home cannot support probable cause. 925 F.3d 305 (6th Cir. 2019) (*en banc*). There, "law enforcement had established surveillance at [a residence] and observed [a man] . . . 'walk away from the area of [the residence] and leave the area in a vehicle,' after which officers stopped [the man] and discovered heroin in his car." *Id.* at 308. Even though the man did not live at the residence, the Sixth Circuit called this surveillance "independently sufficient for probable cause." *Id.* at 311.

Defendant argues that it is important that he paid "a visit to what law enforcement had identified as a relative's house." [Doc. 63 at 5]. *Christian* does not address such a situation and

perhaps the "independently sufficient" finding would have been different under such a scenario.[3] But as noted above, there is a logical case to be made, based on Special Agent Moon's training and experience, that ownership of the house by a relative made the presence of stashed contraband more likely, not less.

Defendant also claims that "his time inside the home lasts 20-30 minutes, certainly longer than one would need to just retrieve drugs." [Doc. 63 at 6]. While that is true, it does not negate the reasonable inference that he stopped there to retrieve drugs. He may have used the restroom, grabbed a quick snack, helped his mother with something, or done any other number of things in addition to possibly retrieving drugs. The approximately half hour stay inside the residence is certainly part of the totality of the circumstances, but it moves the needle very little.

Defendant next argues for the importance that "[Defendant] is not seen carrying anything from Crutchfield as he leaves for the buy—a fact found significant in other comparable cases." *Id.* However, there was no mention of anything being carried by the man who was leaving the residence in *Christian* either. Thus, the Sixth Circuit did not find that to be any impediment to their "independently sufficient" finding regarding surveillance observations.

Defendant further argues that "it is only speculation that [Defendant] did not already have what he needed to distribute [before arriving at 1008 Crutchfield]." *Id.* However, the same could be said of the man arrested in *Christian*. It is entirely possible that the drugs found in his car were there before he left the residence under surveillance. Yet the Sixth Circuit still found the surveillance observations to be "independently sufficient."

Finally, Defendant asks why he would go to 1008 Crutchfield instead of 529 South Germantown if he needed to pick up drugs, when the latter was "the location known by law

---

[3] However, this would seem to defeat the "independent" part of the statement.

enforcement as [Defendant's] current address and as being the address [he] was using to sell narcotics[?]" *Id.* The reasonableness and likelihood of alternative conclusions is certainly germane to the totality of the circumstances, but again, the question is "whether the magistrate had a substantial basis for his conclusion." *Christian*, 925 F.3d at 310. The reviewing magistrate could have reasonably viewed Defendant's trip to 1008 Crutchfield as being for drug retrieval.

Based on the totality of the circumstances, the reviewing magistrate did not arbitrarily exercise (or abuse) his discretion in finding probable cause.

**B.     Good Faith Exception**

Even if Defendant could show that the issuing judge's probable cause determination was improper, the *Leon*[4] good faith exception should apply. This exception requires courts to "ask whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (internal quotation omitted).

Defendant claims the affidavit was insufficient because it is "bare bones." [Doc. 48 at 20]. A "bare bones affidavit" is one "so lacking in indicia of probable cause as to make an officer's belief in its existence objectively unreasonable." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (cleaned up). "We reserve that label for an affidavit that merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id.* (internal quotation omitted). A bare bones affidavit "is one which states only the affiant's belief that probable cause existed." *Id.*

Agent Moon's affidavit provided more than just suspicions or conclusions—it included facts and underlying factual circumstances supporting probable cause. For instance, the timing of

---

[4] Under *United States v. Leon*, evidence should not be excluded if there was "objectively reasonable law enforcement activity," especially good faith reliance on a warrant. 468 U.S. 897, 919-20 (1984).

Defendant's trips to and from 1008 Crutchfield relative to setting up a drug deal and executing the same are facts—not conjecture, suspicions or unsupported conclusions. Further, the veracity, reliability, and basis of knowledge for these facts were personal surveillance and monitoring by the agents. This is but one example of the many facts and underlying factual circumstances included in the affidavit that support probable cause for a search of 1008 Crutchfield. Others are discussed more fully above in Section IV.A.

In short, the search warrant presented adequate support for probable cause upon which a reasonable officer could rely. Thus, even if Defendant could show that the search warrant lacked probable cause, the good faith exception would apply.

## V.     Conclusion

For the reasons stated herein, it is **RECOMMENDED**[5] that Defendant's Motion to Suppress [Doc. 47] be **DENIED.**

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified constitutes a forfeiture of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).